Garland, J.
This is a possessory action, in which the plaintiffs allege, that they are possessors as owners for more than a year, of a tract of land, at a place called the Racourci Bend, on which the defendants have entered and are commiting waste by cutting timber, cordwood, &c. Writs of sequestration and injunction were issued, to arrest the commission of further trespasses and waste. In their petition, the plaintiffs, for the purpose of showing the extent of their possession, set forth the titles under which they hold, commencing with that derived from the Spanish Governor, Carondelet, in 1796.
The defendants, after a general denial) and a special denial of an amicable demand to quit the premises, aver that the land on which they are, and on which the alleged trespasses are said to have been committed, is public, and belongs to the United States; that they have taken possession of it, and expect, in due course of time, by complying with the requirements of the pre-emption laws passed by Congress, to secure a right and title to said land ; and that, therefore, they have a right to possess it.
The taking possession by the defendants was in the months of December, 1841, and January, 1842, a few months after the passage by Congress of the pre-emption law of 4th September, 1841. See acts of 1st session, 27th Congress, Laws United States, vol. 10, p. 155. This suit was instiluted in March, 1842, and the *150 answers of the defendants filed in the month of May following, at which time they had not made any application at the Land Office of the district to purchase the land ■; nor does it appear to have been legally surveyed.
By documents given in evidence it -appears, that on the 10th January, 1796, Ursin, and Dominique Bouligny, each applied to Gov. Carondelet for a tract of land of forty arpents front, by the ordinary depth,within the limits of the post of Pointe Goupée, at a place called La Laguna del Racourcy, upon which the usual orders were issued, directing the surveyor of the province to put each in possession; and on the tract now occupied by the plaintiffs, a settlement was made shortly after. In the year 1808 the Boulignys presented their claims, in the same notice, to the land officers in New Orleans. Their lands are described as being situated “ in the county of Pointe Goupée, containing eighty arpents in front, on the right bank of the Mississippi, by forty arpents in depth.” With this notice and the title papers, a plat of survey made by Charles Morgan, a surveyor, was presented, on which the upper boundary of the eighty arpents is represented as being on or near the bank of the river, which it follows down for a considerable distance, until it reaches a hackberry tree, growing on what is represented and called a willow point; thence the line changes its course, and seems to run along or near to the edge of the willow point for upwards of forty arpents, to the lower boundary. With the exception of a very small portion of the lower end of the lagoon, {laguna,) it is all represented as within the front line ; and it is evident, that the surveyor did not intend to make tfie tract front on it. On the outside of the line a trace or road is represented, as is also the Mississippi river, and a large point or batture covered with willows. But along, or near this line, the parol evidence shows, that there was some high ground on which other trees grew, such as gum, cotton-wood, ash, &c. Upon the title papers, plat, and evidence of settlement, the title for forty arpents front was confirmed, so as to include the improvements. See vol. 2, State Papers, Public Lands, p. 332. At a subsequent period, a claim for the remaining forty arpents front was presented, and recommended for confirmation. See vol. 3, State Papers, Public Lands, p. 257. It is there stated as *151 being on the right bank of the river, at the place commonly called Racourci. In the year 1818, Dominique Bouligny sold to one Martin Tournoir five arpents front of the same tract, which the plaintiff claims, with a reservation to himself of the alluvion or batture in front of it. In January, 1830, Bouligny and Jean Mercier, sold to Martin Bourgeat thirty-five arpents front of the same tract. They describe it as being at a place called the Bai& du Racourci, upon the right bank of the river Mississippi. They then proceed to describe the front, side and rear lines, giving courses and distances, as the whole will appear by a plat said to be annexed to the sale, but which is not produced. They say nothing about a batture or alluvion, but sell the tract as described, with all its appurtenances. On the 7th February, 1833, the heirs of Bourgeat sell something over twenty-one arpents front of the land to Bonis and wife. They describe the land by lines, courses and distances, and say that it has its face sur la bate, with such depth as maybe found, &c., situated at the place commonly called Racourci. To the land so described they give a warranty. They then proceed to say, that t they sell without warranty, all the rights they have or may. have to the portion of the alluvion or batture in front of said tract of land. About the same time the aforesaid heirs sold the remainder of the tract of land to one John C. Turner. It is described as having eight arpents front, by a certain depth. They also sell “ a riparious right to the batture, but without warranty.” The plaintiffs, Turnbull and wife, hold under Turner, with a transfer of all his. rights. About the time these sales were made to Turner and Bonis and wife, H. T. Williams, a United States surveyor, being* engaged in making surveys in that section of country, undertook to locate the Bouligny claims. He seems not to have been very accurately informed as to their titles, nor was he requested by any one interested, so far as the record informs us, to locate the claims, nor were any of the claimants present. He placed the front line of the claim under which the plaintiffs hold, a considerable distance from the river, following very nearly the lines of Morgan, which were run in 1808 ; and he represented the land between that line and the river, as public. This survey has never been approved, and the surveyor, becoming himself Sur *152 veyor General, declined approving his own work, in consequence of representations being made to show its want of accuracy. The present Surveyor General of the United States also declines approving it. Since the institution of this suit, in consequence of representations made by one or more of the defendants, a survey was ordered by the Surveyor General now in office ; but as soon as he was more fully informed he arrested the execution of his o rder, and has never approved the work of his deputy. Upon a sketch or plat made by the deputy surveyor last mentioned, the defendants, Hornsby and Printey, presented themselves at the Land Office, more than one year after the commencement of this suit, and claimed a pre-emption right on proof of settlement, but could not complete the purchase, as there was no approved township map in the office,
The parol testimony is voluminous, and shows what has been the condition of the land for more than forty years. The witnesses who have known the point or batture longest, say that, in front of the lagoon or bate, there was at their earliest recollection a ridge of high land, on which cane and trees of large size grew, which was not overflowed except at the very highest stage of the river; and that on this the road ran. There were other ridges and sloughs across the point, in early times. They all seem to have been annually covered with water. The point or batture has increased in dimensions, and become higher every year. There are now large trees in many places, and land susceptible of cultivation, showing that the formation was ancient. What the situation of the batture was at the time the land was granted in 1796 is not shown ; but it is difficult to believe that the Spanish Governor intended that there should be a narrow-slip of high ground in front of the land he granted, thus preventing the grantees from getting to the river. It is apparent from the plat of Morgan’s survey made in 1808, that he did not intend that the lagoon should be the front; and it would also seem, that he ran the line as near to the willow bank as it could well be done. We know it is not the practice of surveyors in measuring a base or front line, to follow the bends of the stream to get the distance or quantity wanted ; but to run their lines straight, changing their direction only when necessary to enable them to *153 reach the point of destination. It is, therefore, not at all surprising that some spots of high land should be found outside of the front line, as run by the surveyor.
The main, question in the cause is, was it intended that the claim of Bouligny should front on the river ? When we take into consideration the usages and laws under the Spanish government, they raise a strong presumption that such was the intention. When we look at the confirmation of the titles by the United States, we see the lands described as on the right bank of river. These terms are not generally used to describe land lying at a distance from the bank. In 1818, the grantee Bouligny certainly conceived that he had some right to the batture, as he reserved it in his sale to Tournoir. The vendors of the plaintiffs, in 1833, supposed that they had some claim to it also, as they sold all their rights to the plaintiffs, who possessed under this claim of right, until disturbed by the defendants. But say their counsel, Bourgeat did not acquire any right to the batture by his purchase from Bouligny and Mercier, and, therefore, could not transfer it, even admitting that the last were entitled to it. This is perhaps true; yet his heirs sold all their rights to the plaintiffs, whatever they were; and they had possessed as owners more than eight years under these sales, previous to the defendants going on the land. In this action we cannot inquire into the validity of the plaintiffs’ titles to the property. The question is simply one of possession. For several years before the defendants went on the premises, the plaintiffs occupied them, under notarial acts of sale. Two or more small houses had been erected, some fences had been put up, and wood had been cut at different places. Open and public acts of ownership were exercised. Shortly after the defendants took possession, they were notified of the claim of the plaintiffs, notwithstanding which they persisted in remaining on the land; and, more than a year after the institution of this suit, endeavored to get a title to it, by the presentation of an unapproved and unauthorized plat of survey to the Register of the Land Office, and by attempting to prove a settlement on land to which, at the time, they knew that others set up a claim.
When persons wish to obtain a right of pre-emption from the *154 United States, they must take care to settle on lands belonging to the government, and not on those notoriously possessed by others as owners, under an apparent title. It cannot be permitted to any one, under the pretext of an intention to acquire a title by purchase from the United States, to assume that the land he fancies, though in the possession of another, is public, and therefore, liable to be entered on at pleasure, and the possessor’s title subjected to investigation at the instance of a trespasser. 3 Rob. 318. Code of Pract. art. 47.

Judgment affirmed.